FREDRIK D. HOLTH, SUCCESSOR TRUSTEE,
ET AL. *v.* CHELSEA GROTON BANK
(AC 34346)

Lavine, Robinson and Bear, Js.

---

Argued April 17—officially released July 2, 2013

*Dana M. Hrelic*, with whom were *Brendon P. Levesque* and, on the brief, *Karen L. Dowd* and *Thor Holth*, for the appellants (plaintiffs).

*Stephen R. Klaffky*, with whom, on the brief, was *William M. Dolan III*, for the appellee (defendant).

### Opinion

BEAR, J. As alleged in the plaintiffs' complaint, Frederick Kauppinen and Lillian Kauppinen established a total of nine revocable and spray trusts. The plaintiffs, Kathryn Guinan, successor trustee of eight of the Kauppinen trusts, and Kenneth Korsu and Heather Korsu, successor trustees of the Ilona Korsu Spray Trust,[1] the ninth Kauppinen trust relevant to the present case (collectively, trusts), appeal from the judgment of the trial court, rendered in favor of the defendant, Chelsea Groton Bank (bank), following the court's granting of the defendant's motion to strike the plaintiffs' complaint in its entirety. On appeal, the plaintiffs claim that the court improperly struck their complaint after finding that the defendant owed to the plaintiffs no legal duty to investigate a trustee's use of proceeds from a prior transaction before making its loan to the trusts. We affirm the judgment of the trial court.

The plaintiffs alleged the following relevant facts in their complaint. Prior to the appointment of the plaintiffs as successor trustees, F. Robert LaSaracina held himself out to the bank and to the public as the trustee of the trusts. In April, 2009, LaSaracina, acting as trustee

---

[1] Guinan replaced the named plaintiff, Fredrik D. Holth, successor trustee, following his death. Holth and the Korsus had replaced former trustee, F. Robert LaSaracina. The trial court explained that LaSaracina had been removed as trustee after it was discovered that he "had diverted to himself large portions of the res of the [t]rusts."

for the trusts, applied to the bank for a $1,300,000 loan that was to be secured by a mortgage on real property and a Uniform Commercial Code (UCC) security interest in other property owned by the trusts. The alleged purpose of the loan was to refinance two secured $600,000 promissory notes that the trusts had given to Flushing Savings Bank, each of which was in default with a default interest rate of 24 percent. The total amount due on the loans was $1,294,797.85. LaSaracina represented to the bank that the purpose of the $1,300,000 loan was to refinance the trusts' obligations to Flushing Savings Bank. The bank accepted LaSaracina's loan application—which was accompanied only by copies of the trusts' 1041 tax returns and the K-1 tax forms issued to the beneficiaries for 2007 and 2008, and copies of two leases of trust property to commercial tenants—and it processed and approved the loan. The plaintiffs further alleged that if the bank carefully had reviewed LaSaracina's loan application and other materials, it would have discovered that LaSaracina had used the proceeds from the Flushing Savings Bank loans for his own purposes and that he also was going to use the bank's loan for his own purposes.

On the basis of these alleged facts, the plaintiffs filed a four count complaint against the bank. In the first count, they alleged that the bank was negligent in handling the loan transaction and that this negligence assisted LaSaracina in breaching his obligations to the trusts. In the second count, the plaintiffs alleged that the bank's actions constituted a breach of the bank's contract with the trusts that enabled LaSaracina to breach his fiduciary duties to the trusts. In the third count, the plaintiffs sought to quiet title to the mortgaged real estate by claiming that the bank's mortgage was invalid due to the wrongful conduct of LaSaracina. In the final count, the plaintiffs alleged that any interest

that the bank holds in the mortgaged real estate actually is held in constructive trust for the benefit of the trusts.

On July 21, 2011, the bank filed a motion to strike the complaint in its entirety on the ground that it owed to the trusts no legal duty to investigate LaSaracina before giving a loan to the trusts in exchange for a mortgage on real property and a security interest in other trust property. The bank further argued that the Fiduciary Powers Act, General Statutes § 45a-33 et seq., "unequivocally 'discharges' any lender extending a mortgage loan to a trustee from any liability arising from the trustee's misappropriation of the loan proceeds, and expressly states that no lender shall have any duty to see to the application of the proceeds or any duty to 'ascertain or inquire' into the trustee's purpose or authority for entering the transaction." Additionally, the bank argued that the trusts' "indentures similarly provide that any party transacting business with the trustees shall have no duty to inquire into or investigate the trustees' authority and no duty to see to the application of the transaction proceeds." In response, the plaintiffs argued that the relevant portion of the Fiduciary Powers Act, specifically General Statutes § 45a-244 (2), did not apply in this case because it was not incorporated by reference or adopted verbatim in the trust indentures as required by General Statutes § 45a-233 (c). In addition, they argued that the trust indentures only relieved the bank of liability for LaSaracina's action if LaSaracina was acting in furtherance of the trusts' interests, rather than in furtherance of his own interests. They asserted that pursuant to this state's common law, the bank owed to the trusts a duty to inquire or investigate.[2]

On January 12, 2012, the court granted the bank's motion to strike each count of the plaintiffs' complaint,

---

[2] Both parties agree on appeal that the common law applies in this case.

holding that "the information in the [b]ank's possession when it entered into the loan transaction with the [t]rusts did not create a duty to investigate LaSaracina's past wrongful conduct."[3] The court explained that the plaintiffs alleged in their complaint that "the [b]ank received a pledge of the [t]rusts' assets in connection with a loan to the [t]rusts, not to LaSaracina personally. Furthermore . . . all of the proceeds of the [b]ank's loan went to relieve the [t]rusts' obligations to Flushing Savings Bank." The court concluded that the plaintiffs did not allege that the bank had knowledge of LaSaracina's prior misappropriation of the trusts' property; rather, the plaintiffs alleged only that the bank had a duty to conduct an inquiry to discover such misappropriation. The court, however, concluded that the law did not support the imposition of such a duty, and it granted the bank's motion to strike the complaint. Following the plaintiffs' failure to replead within fifteen days, the bank filed a motion for judgment, which the court granted. See Practice Book § 10-44. The plaintiffs then filed the present appeal.

On appeal, the plaintiffs claim that the court improperly struck their complaint in its entirety after finding that the defendant owed to the plaintiffs no legal duty to investigate. They contend that the court's "reasoning [was] fatally flawed in that the court misinterpreted and therefore misapplied the law governing when a bank's duty to investigate attaches." The plaintiffs argue: "The crux of [our] claim is that the [bank] had constructive knowledge of LaSaracina's activities by virtue of the fact that it had sufficient information from which it had a duty to conduct further inquiry, and had it conducted such inquiry it would have discovered

[3] The court explained that "the plaintiffs' opposition to the motion to strike [was] based entirely on the theory that the [b]ank was put on inquiry and had a duty to investigate what LaSaracina had been doing with trust assets."

that it was assisting LaSaracina in his breach of trust." (Internal quotation marks omitted.) Citing *Leake* v. *Watson*, 58 Conn. 332, 343, 20 A. 343 (1890), the plaintiffs contend that "where a party has knowledge that the property being passed to them is trust property, they are 'put upon inquiry,' and 'the law imputes to them such knowledge as they would have obtained had they made inquiry.' " They continue: "If the court had performed a correct analysis of [prior case law,] it would have come to the conclusion that the [plaintiffs'] complaint does sufficiently allege the [bank's] knowledge that it had received trust property. . . . This allegation is *all* that the [plaintiffs] needed to make in order to establish the creation of a duty of inquiry, which case law shows the [bank] had in the present case, and to therefore survive the [bank's] motion to strike." (Emphasis in original.) We are not persuaded.

"Our standard of review is undisputed. Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling on [a motion to strike] is plenary. . . . On a motion to strike, the trial court's inquiry is to ascertain whether the allegations in each count, if proven, would state a claim on which relief could be granted. . . . [I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. In doing so, moreover, we read the allegations broadly, rather than narrowly." (Citations omitted; internal quotation marks omitted.) *Advanced Financial Services, Inc.* v. *Associated Appraisal Services, Inc.*, 79 Conn. App. 22, 37, 830 A.2d 240 (2003).

"The test for the existence of a legal duty is twofold. It entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the

defendant knew or should have known, would antici-
pate that harm of the general nature of that suffered
was likely to result, and (2) a determination, on the basis
of a public policy analysis, of whether the defendant's
responsibility for its negligent conduct should extend
to the particular consequences or particular plaintiff in
the case. . . . The first part of the test invokes the
question of foreseeability, and the second part invokes
the question of policy." (Internal quotation marks omit-
ted.) *Del Core* v. *Mohican Historic Housing Associates*,
81 Conn. App. 120, 123–24, 837 A.2d 902 (2004).

In the present case, the plaintiffs set forth only one
argument in support of their claim—that to establish a
duty to inquire or investigate in the present case, they
simply needed to allege that the bank had knowledge
that it was receiving trust property and that this allega-
tion alone sufficed to establish a duty to inquire or
investigate. During oral argument, this court asked the
plaintiffs' counsel what specific inquiry she was claim-
ing the bank had a duty to make, and she responded
that the bank had a duty to conduct an investigation
as to the use of the loan proceeds. When this court
asked counsel whether the bank knew that the proceeds
from the bank's loan were going to pay off the Flushing
Savings Bank loans in order to obtain release of the
mortgage held by Flushing Savings Bank on the trusts'
property, counsel initially said no—that the bank gave
LaSaracina a check for $1,300,000 for his own use; coun-
sel then acknowledged some confusion about the accu-
racy of her answer. During her rebuttal argument
counsel corrected her statement and acknowledged
that the bank loan proceeds were used to pay off the
Flushing Savings Bank loans and to obtain a release of
the mortgage held by Flushing Savings Bank on the
trusts' property that was securing those loans.[4] Counsel

---

[4] The plaintiffs alleged in their complaint that in April, 2009, LaSaracina,
acting in his capacity as trustee, applied to the bank for a loan to be secured
by a real property mortgage and UCC security interest relating to "[t]rust

also argued, however, that the bank's duty to inquire or investigate would require more than just knowing that the loan from the bank was being used to pay off the loans from Flushing Savings Bank; it would require that the bank investigate the purpose, use and status of the Flushing Savings Bank loans.[5] The bank contends that our law does not recognize any duty requiring it to investigate the trustee or any previous transaction in the absence of its knowledge of any wrongdoing.

As to the plaintiffs' argument that the bank had a duty to conduct an inquiry into the use of the loan proceeds, we conclude that even if there exists such a duty, it is uncontested in this case that the bank knew the intended use of the loan proceeds as the plaintiffs alleged in their complaint, i.e., to pay off the Flushing Savings Bank loans and to obtain the release of the mortgage and UCC security interests securing those loans. As to the plaintiffs' additional argument that the duty to inquire also required the bank to examine fully the circumstances surrounding the Flushing Savings Bank loans, we conclude that the plaintiffs' proposition is not supported by our case law.

The plaintiffs primarily rely on the case of *Leake* v. *Watson*, supra, 58 Conn. 332, to support their argument that, because the bank knew it was dealing with trust property, it had a duty to investigate the circumstances surrounding the Flushing Savings Bank loans. In *Leake*, the plaintiff successor trustee brought an action against

property in the amount of $1,300,000.00 for an alleged refinance of two alleged prior promissory notes secured by alleged mortgages and security interests to Flushing Savings Bank . . . ."

[5] The plaintiffs also alleged during oral argument on appeal that if the bank had undertaken a review of the trust documents, it would have learned that a cosigner was required for the bank loan. This allegation, however, is absent from the plaintiffs' complaint, and we are unable to find mention of it anywhere in the record. The plaintiffs chose to permit judgment to enter in this case, rather than to replead their complaint. We, therefore, are unable to consider this new allegation.

the defendant brokers to recover the value of trust property that the brokers had received and squandered on stock speculations with the approval of the former trustee and the beneficiary of a life estate in the trust. Id., 332. The court explained: "So long as trust property improperly sold can be traced and identified, the holder taking it with knowledge, it remains trust property. When it is sold pursuant to the terms of the trust, or apparently so, and the purchaser takes it in good faith, he takes it freed from the trust. In this case, the findings show that most of the property passed from the trustee to the defendants as trust property, in gross violation of the trust, with the defendants' full knowledge. We say with the defendants' full knowledge, *because the defendants, knowing that it was trust property, were put upon inquiry*, and the law imputes to them such knowledge as they would have obtained had they made inquiry. The trust, its terms, conditions and limitations, were matters of record. *Inquiry, properly directed, would have brought to them full knowledge as to the origin and nature of the trust, and that other parties . . . were interested in it.*" (Emphasis added.) Id., 351–52. The court further explained that the defendants knew that the former trustee and the beneficiary of a life estate in the trust "were using the property in hazardous business—stock speculations; that they themselves were taking the only certain profits, their commissions, while doubtful profits, almost certain losses, and probably complete disaster in the end, were the prerequisites of the other party." Id., 352.

The court in *Leake* imputed to the defendant brokers a duty to inquire into the origin and nature of the trust, which would have revealed that other parties had an interest in the trust, because the defendant brokers knew that the trust property was being squandered in hazardous business dealings. Id. We conclude that *Leake* is distinguishable from the present case because

the plaintiffs here allege that the bank's duty of inquiry involved a duty to investigate the circumstances surrounding the creation and use of the Flushing Savings Bank loans in which the bank had no involvement. The duty that the plaintiffs seek to impute to the bank goes well beyond any duty imputed to the defendant brokers in *Leake*. Accordingly, we conclude that *Leake* does not support the plaintiffs' argument that the bank had a duty to investigate the circumstances of the loans that Flushing Savings Bank previously extended to the trusts.

The bank relies, in part, on *Goodwin* v. *American National Bank*, 48 Conn. 550 (1881), to support its argument that the trial court's decision that the bank had no duty to investigate some unknown misconduct on the part of LaSaracina in obtaining the Flushing Savings Bank loans. Rather than address the holding in *Goodwin*, the plaintiffs argue that "*Goodwin* is inapposite to the present case because it was decided in 1881, *before* the landmark Connecticut case that recognizes the duty to investigate where known trust property is concerned . . . . *Leake*, which was decided in 1890 . . . is still good law . . . and is controlling." (Emphasis in original.) We are not persuaded that *Leake* overruled *Goodwin* or that it called into question the holding in *Goodwin*, and, accordingly, we conclude that *Goodwin* remains good law and that it is relevant to the present case.

In *Goodwin*, L. T. Pitkin had two accounts with the defendant, American National Bank. *Goodwin* v. *American National Bank*, supra, 48 Conn. 550. The first account was a · personal account, and the second account was held in his capacity as town treasurer (town account). Id., 552. Pitkin, at times, transferred money between these two accounts. Id., 553. He also withdrew more than $8000 from the town account with checks payable to bearer. Id. After the death of his

father, Pitkin was appointed executor of his father's estate. Id., 551. As executor, Pitkin applied for a $10,000 loan from the defendant, using stock of the estate as collateral. Id., 551–52. He expressed to the defendant that the estate needed the money to pay certain legacies pursuant to the will. Id., 552. The defendant gave Pitkin the loan, which he deposited into his personal account, despite the existence of an account for the estate. Id. The defendant successively renewed the note over a four year period, every four months. Id., 552–53. The note was never paid, and Pitkin fled the state, "largely in default as executor, and also as treasurer of East Hartford." Id., 554. The defendant transferred the collateral stock to itself and received the dividends thereon. Id., 555.

The plaintiff in *Goodwin,* the administrator of the estate of Pitkin's father, brought an action against the defendant to compel the transfer of the stock to himself, as administrator, claiming that the defendant had knowledge that the money it loaned the estate was being used in a fraudulent manner by Pitkin. Id., 551, 564. The plaintiff claimed that the defendant was put on inquiry because Pitkin had deposited the money in his personal account. Id., 564. The court explained that because the defendant acted in good faith, relying on Pitkin's representation that the money would be used in accordance with his powers as executor, the defendant "came under no obligation to see to the proper application of the money [because it] did not become the insurer of the estate against a devastavit."[6] Id., 565. The distinction between *Goodwin* and *Leake* readily is apparent. The defendant brokers in *Leake* had a duty to inquire because they knew that the money was being used for an improper purpose, namely, to engage in

---

[6] Devastavit is defined as: "A personal representative's failure to administer a decedent's estate promptly and properly, esp. by spending extravagantly or misapplying assets." Black's Law Dictionary (7th Ed. 1999) p. 461.

hazardous business dealings; *Leake* v. *Watson,* supra, 58 Conn. 322; while the defendant bank in *Goodwin* loaned the money to Pitkin on the basis of representations that the money was being used for a proper purpose in accordance with the authority vested in Pitkin as the executor of the estate. *Goodwin* v. *American National Bank,* supra, 48 Conn. 565; see also *Lowndes* v. *City National Bank of South Norwalk,* 82 Conn. 8, 19, 72 A. 150 (1909) (bank cannot knowingly participate in misappropriation of trust funds but has no duty to supervise and safeguard trust funds or to inquire where mere suspicion might be present).

In the present case, the plaintiffs are attempting to impute a duty to the bank that simply is not cognizable under our law and the facts as alleged in their complaint. The plaintiffs allege and acknowledge that LaSaracina was acting as the trustee of the trusts when he requested a loan from the bank to refinance the existing loans of the trusts with Flushing Savings Bank. The complaint fairly can be read to allege that the bank extended the requested loan to the trusts, paid off the Flushing Savings Bank loans with all of the net loan proceeds, secured release of the mortgage on the trust property held by Flushing Savings Bank and took its own mortgage on that trust property. The plaintiffs do not allege that the bank had any knowledge that LaSaracina may have used the funds from the Flushing Savings Bank loans for an improper purpose, and, without knowledge of any wrongdoing, under our law the bank had no duty to inquire about those prior completed loans before making its loan to the trusts. Accordingly, we conclude that the court properly granted the bank's motion to strike.

The judgment is affirmed.

In this opinion the other judges concurred.